IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DONNA FAYE REED and )
WILLIAM F. REED ) No. 3-07-0809
 )
v. )
 )
UNITED STATES OF AMERICA )

**M E M O R A N D U M**

Plaintiffs Donna Faye Reed ("the plaintiff") and William W. Reed ("Mr. Reed"), residents of Tennessee Ridge in Houston County, Tennessee, filed this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346 and 2671 et. seq, asserting the defendant or its employees were negligent in failing to secure a display sign that fell on her while she was shopping on February 2, 2006, at the Fort Campbell Post Exchange ("PX") operated by the Army Air Force Exchange Service ("AAFES"). The plaintiff sought damages for the alleged injuries she suffered, specifically, a torn rotator cuff in her right shoulder and a left thumb injury. Mr. Reed sought damages for loss of consortium. Mr. Reed died during the pendency of this case, and the plaintiff filed a Notice of Reviver as his surviving spouse and next of kin. See Docket Entry No. 13.

The defendant has conceded liability for any damages proximately caused by the sign falling on Ms. Reed, but denies that she suffered the injuries as a result of the February 2, 2006, incident.

**I. BACKGROUND**

On February 2, 2006, the plaintiff's 59th birthday, she went shopping at the PX. As she was browsing through women's clothes, a Valentine's display sign fell from the wall and struck the plaintiff on her right shoulder or her neck right above her right shoulder. The specific sign that hit the plaintiff is no longer available. The impact caused her to be "knocked" to her knees but she did not fall to the ground. She approached a store employee and was taken to the office of Ann Yi, the sales and merchandise manager, where Stephanie Lipscomb (now Wilson) gave her an ice pack for

her shoulder. After the plaintiff left the PX, she went to the Ft. Campbell emergency room. Shortly thereafter, she began to see Dr. William Beauchamp, an orthopaedic surgeon. On March 27, 2006, an MRI revealed that the plaintiff had a torn rotator cuff in her right shoulder. Dr. Beauchamp performed rotator cuff repair surgery on June 16, 2006. On September 29, 2006, Dr. Beauchamp performed trigger thumb release surgery on the plaintiff's left thumb.

The plaintiff returned to her part-time job at Work Force Essentials six weeks after her surgery. She left her job in May of 2007, to spend more time with her husband.

Mr. Reed was retired from the Army with a service-connected disability. He was blind in one eye and had other health conditions. He died on January 30, 2008, at age 77. The plaintiff and Mr. Reed had been married for 12 years.

On Thursday, February 2, 2006, prior to going to the PX, the plaintiff had presented to a nurse to refill her thyroid medication and did not mention any complaint about her right arm or shoulder. The plaintiff's prior, relevant medical history includes gastric bypass surgery in April of 2004, and a diagnosis of "frozen shoulder" of her left shoulder in July of 2004. After physical therapy on her left shoulder, the plaintiff did not have any further problems with her left shoulder. There is no mention in any of the plaintiff's medical records of any problem with her right arm or shoulder prior to February 2, 2006.

Dr. Roy C. Terry, an orthopedic surgeon, conducted an independent medical examination of the plaintiff on behest of the defendant. He opined that the impact of the sign could not have caused the plaintiff's rotator cuff tear.

Once the plaintiff recovered from the rotator cuff injury, Dr. Beauchamp assessed the plaintiff with a ten percent disability to the body as a whole. Although not included in his medical records, Dr. Beauchamp opined that the plaintiff's rotator cuff tear resulted from her "jerking away" as the sign hit her shoulder rather than from the impact itself.

2

## II. SUMMARY OF TESTIMONY AT TRIAL

**A.     The Plaintiff**

The plaintiff testified that she went to the PX by herself and her husband remained at home. She described the sign that fell on her as 3 to 4 times bigger than the sign produced by the defendant as Defendant's Exhibit 1, and as having a silver frame.[1] She also related that her arm was red and had begun to swell after the sign fell on her. The plaintiff notified a PX employee who took her to the office of Ann Yi, where she was given ice to put on her shoulder and provided information for an accident report, and where she testified she remained for about an hour. The plaintiff denied making a statement that "I fell on my bad arm," and explained that she said, "I'm glad it didn't hit my left shoulder because I have had problems with my left shoulder." She conceded that she might have used the phrase "bad shoulder" referring to her left shoulder. She declined the offer to call an ambulance for her, and, according to the plaintiff, after she left the office, she continued to shop, but, when her shoulder/arm began to hurt, she called her husband who advised her to go to the emergency room before returning home.

According to the plaintiff, over the weekend her pain increased, and on Sunday, February 5, 2006, her left thumb began to hurt. She sought medical attention on Monday, February 6, 2006,[2] at which time she testified that she mentioned her pain in her left thumb but the doctor did not want to address that issue. She returned to the Ft. Campbell physician on March 1, 2006, and was referred to Dr. Beauchamp, an orthopaedic surgeon. She saw Dr. Beauchamp on March 23, 2006, April 12, 2006, and May 24, 2006. She was prescribed Lortab for her pain and an MRI revealed the rotator cuff tear. She had rotator cuff surgery on June 16, 2006, which she described as worse than having "three babies at a time."

---

[1] Since the actual sign was unavailable, the defendant represented that Defendant's Exhibit 1 was a sign in size and weight exactly equivalent to the sign that fell on the plaintiff, although the promotional contents of the sign itself are different.

[2] Plaintiff's counsel suggested that February 6, 2006, was a Tuesday, but, in fact, it was a Monday.

3

The plaintiff testified that, after her surgery, she was in pain and on pain medication, could not use her arm, had difficulty sleeping, slept in a recliner for about five weeks, and could not dress herself or bathe for over a month or drive for six weeks. During that time, Mr. Reed cooked, dressed her and helped her bathe. After six weeks, she had physical therapy for eight weeks. After completing her physical therapy sessions, the plaintiff testified that she continued to exercise to some extent at home, but she acknowledged that she was "bad about exercising" and then "quit" exercising at home. By October 7, 2006, the plaintiff described her recovery as "as good as it got." The plaintiff related that she continues to take Celebrex for pain and took Motrin for pain during her recuperation period, although she was not willing to take more powerful pain medications as Dr. Beauchamp recommended.

The plaintiff no longer sees Dr. Beauchamp or any doctor about her shoulder or her thumb. The plaintiff reported that she is unable to lift, has to have assistance cleaning her house, and cannot cook for her church club or have Thanksgiving dinner at her home. She testified that she still has pain in her shoulder/arm when the weather changes or she engages in strenuous activity. She also related that she still has problems with her thumb when she drives for "a period of time," and it aches during rainy weather. She testified that she had never worked under circumstances requiring "heavy repetitive use" of her hands.

The plaintiff returned to her employment at Workforce Essentials in the fall of 2006, but left in May of 2007, to spend more time at home because she "couldn't get things done like [she] did before," referring to housework and giving attention to her husband. However, she continues to perform part-time work, mostly for TVA, drug-testing employees.

The plaintiff denied ever having fallen in her laundry room and denied that her husband ever suggested that she have shoulder surgery rather than gastric bypass surgery.

The plaintiff testified that her husband and Ron Strickland were friends and, although they had a "falling out" in 2007, they "made up" before Mr. Reed's death and Mr. Strickland was a pall bearer at his funeral in January of 2008. After Mr. Reed's death, Mr. Strickland bought two horses,

4

a horse trailer, an antique car, and a metal building from her.  The plaintiff testified that Mr. Strickland brought the horses he had purchased from her and three other horses to graze on her land for $100.00 a month and his agreement to fix the fences.  According to the plaintiff, the horses remained on her property for six months and Mr. Strickland only made one payment of $100.00, and, when he did not fix the fences, the horses got out, neighbors called her and the police came twice about the escaped horses.

According to the plaintiff, Mr. Strickland also wanted to purchase a tractor, but instead borrowed it until he could get $3500.00 to pay for it.  However, the plaintiff testified that Mr. Strickland kept the tractor for over six weeks and did not return it.  She enlisted her son-in-law Jeff Abbott to retrieve the tractor.  When she and her son-in-law went to retrieve the tractor, they had difficulty starting it and the plaintiff testified that Mr. Strickland said, "I am through with you."

On cross examination, the plaintiff testified that she went to Mexico in April of 2006, before her June 2006, rotator cuff surgery.  She explained that she traveled to Texas for ten days, crossed into Mexico for one day for shopping and lunch, and, for the last leg of her trip home, travelled from Memphis on the back of a motorcycle driven by her husband.

The plaintiff acknowledged having called Mr. Strickland's home by mistake after Mr. Strickland's deposition and having talked to his girlfriend, Barbara Scott.  She testified that she was not sure whether or not she had told Ms. Scott that she was upset by Mr. Strickland's deposition testimony, but denied telling her that she (the plaintiff) could go to jail or that her family would get even with Mr. Strickland's family.

### B. Plaintiff's Witnesses

1.  Michelle McCaleb, a senior case manager for Workforce Essentials, testified that the plaintiff began working as a receptionist in 2005, and that, after her rotator cuff surgery, the plaintiff could not raise her arm and that she was in pain for the first several months after surgery.  According

5

to Ms. McCaleb, the plaintiff's shoulder "still wasn't like it was before" when the plaintiff left in May of 2007. Ms. McCaleb denied that the plaintiff's job involved any repetitive hand use.

2. Jeff Abbott, the plaintiff's son-in-law and husband of plaintiff's daughter Shala, testified that, before February of 2006, he never heard the plaintiff complain about problems with her right arm or right shoulder, and described her as being in a "lot of pain" for the first few months after surgery. However, Mr. Abbott also clearly testified that he had been to the plaintiff's home for holiday dinners after her rotator cuff surgery, but that it appeared to him that she cannot use her arm "as well as she could before."

Mr. Abbott recounted that he had accompanied the plaintiff to Mr. Strickland's residence in June of 2008, to retrieve the plaintiff's tractor. He testified that Mr. Strickland appeared upset with the plaintiff and told her "he was done with her" and "didn't want nothing else to do with her." Mr. Abbott testified that the tractor would not start because the "fuel cut-off shut off on it." However, Mr. Abbott acknowledged that he had no reason to believe that Mr. Strickland had intentionally made the tractor inoperable.

3. Marilyn Collins testified that she met the plaintiff at church in 2001, and they have been friends since then. She related that the plaintiff had never complained about right arm or shoulder problems. She also described the plaintiff as a "neat person," and, if Mr. Reed had complained about her housekeeping, he "was joking." She also testified that the plaintiff was in greater pain after her rotator cuff surgery than she had been after her gastric bypass surgery, and that the plaintiff took strong pain medications after her rotator cuff surgery.

4. John Collins, married to Marilyn Collins, testified that he retired after more than 20 years in the Air Force and that he has been a nurse for 20 years. He related that he had visited the plaintiff in her home after her bypass surgery and after her shoulder surgery and described her as less active, in more pain and unable to perform her daily activities after her shoulder surgery. He also testified that Mr. Reed had to assist her in dressing, feed her, and take care of her. He also recounted that the plaintiff still has limited mobility without her former range of motion since she

6

is not able to lift her arm as high and does not have the movement in her arm that she previously did. He also testified that she has "some pain and discomfort" that she never complained about before.

     5.     Gayle Caplinger testified that she met the plaintiff in 2001 through church, and that she was a good housekeeper. Ms. Caplinger related that, after her shoulder surgery, the plaintiff paid her to clean her house, which she continues to do. Ms. Caplinger described the plaintiff as being unable to reach a high plate in a cupboard, and that she gets "flustered" and "aggravated" when she is unable to "do things" she previously could. Ms. Caplinger testified that she can see the plaintiff's pain in her face and has seen her cry on occasion.

     6.     Alicia Zeedar, the plaintiff's daughter, testified that she has been a medical assistant for ten years, conducting physical examinations for insurance companies. She reported that the plaintiff had a full recovery from her "left shoulder strain" in 2004, and never had any problems with her right shoulder or right arm before February of 2006. She testified that, before her surgery, the plaintiff did most of the housework and cooking. She explained that the motorcycle that Mr. Reed, her step-father, owned was a Gold Wing "luxury" motorcycle that allows a passenger to lean back, has two armrests for the passenger, and the passenger does not have to hold on to the driver.

Ms. Zeedar described the aftermath of the plaintiff's shoulder surgery as far worse than the aftermath of her gastric bypass surgery. She testified that Mr. Reed had to dress and undress the plaintiff. She reported that the family has Thanksgiving dinners at her sister Shala's home because the plaintiff cannot lift the turkeys, and that the family eats at the plaintiff's home only when there is not "a big meal preparation." She acknowledged that the plaintiff had gone to casinos in the past, but that "playing the slots" requires only pushing buttons and does not require pushing handles.

     7.     Lisa Hall, the plaintiff's niece, testified that she is a nurse at Austin Peay State University, and that the plaintiff never had any problems with her right arm or shoulder before February of 2006. She described the plaintiff as being in "pretty severe pain" for the first 1 to 2 months, but she gradually improved and, by the fall of 2006, the plaintiff was "doing more things." Ms. Hall testified that the difference in the plaintiff's activity level now was in her ability to reach.

7

### C. Defendant's Witnesses

1. Patricia Murauskas, Visual Marketing Manager for the PX, testified that all signs used at the PX are a standard size and type and AAFES dictates how the signage is displayed so that every store will look exactly the same. She explained that, as of February of 2006, all signs were in a "Mark Brick" plastic frame to be adhered to the wall with "marshmallows," which are industrial strength adhesive cubes. All signs came from the headquarters; she estimated that the signs were 24 by 36 inches and testified that all signs were hung on the walls. She testified that Defendant's Exhibit 1 was an exact replica in terms of size and shape of the sign that fell on the plaintiff. Plaintiff's counsel showed Ms. Murauskas Defendant's Exhibit 2-A, 2-B, and 2-C that appeared to depict two signs connected to each other or, as plaintiff's counsel suggested, a sign twice as large as Defendant's Exhibit 1. However, Ms. Murauskas explained that the pictures showed two signs next to each other, not one sign.

2. Stephanie Lipscomb (now Wilson), testified that, although she now works in an AAFES Campbell "shopette" at Ft. Campbell, she was employed at the PX on February 2, 2006, when she gave the plaintiff an ice pack after the sign fell on the plaintiff. Ms. Wilson described the plaintiff as "calm" and "collected" and "nothing like shook up." She testified that the plaintiff did not mention any injury other than her right shoulder and arm.

3. Ann Yi, the sales and merchandise manager at the PX, testified that she interviewed the plaintiff after the sign fell on her, and that the plaintiff had "her hand on her shoulder, saying this is my bad shoulder. She had a real concern that the sign fell on her bad shoulder." Ms. Yi related that the plaintiff stayed in her office 20-30 minutes. Ms. Yi testified that, when the plaintiff left her office, the plaintiff said "she had her husband on the floor," and was going to look for him. Ms. Yi indicated that she believed that the plaintiff had continued shopping and paid for her merchandise.

Ms. Yi also testified that, after February 2, 2006, the plaintiff called her three times. According to Ms. Yi, during the first conversation, the plaintiff simply advised that she was there [presumably at Ft. Campbell] to visit her doctor and "just giving [Ms. Yi] a call;" during the second

conversation, the plaintiff mentioned her shoulder; and during the third conversation, the plaintiff advised that she was going to have surgery. Ms. Yi testified that the plaintiff never mentioned anything about insurance and she described the calls as "peculiar."

Ms. Yi explained that the sign at issue had not been preserved because the plaintiff said she was "okay" and she intended to continue shopping. During cross examination, Ms. Yi agreed that she had not mentioned the plaintiff's reference to her "bad shoulder" in the accident report, see Plaintiff's Exhibit 9, and that she had not testified in her deposition that the plaintiff had mentioned surgery in any of her telephone conversations.

3. Ronald Strickland, testified that he is employed as a contractor with the military, having spent 22-1/2 years n the Army. He described his relationship with Mr. Reed as "real close friends," having met him in 2000. He also described the appearance of the plaintiff's home as "quite cluttered" since the plaintiff is "quite a collector," and related that Mr. Reed often complained about her housekeeping. He testified that Mr. Reed "would always have to clear off the table" before he and Mr. Reed could eat and that the "kitchen sink was always full of dishes." He described Mr. Reed as very healthy and strong and "probably about the healthiest man I know of at his age." Mr. Strickland related that Mr. Reed fed and rode his horses and rode a motorcycle, and that he had never seen the plaintiff "waiting on" or "caring" for Mr. Reed.

Mr. Strickland described an occasion when the plaintiff went to the basement to retrieve laundry and tripped in the basement. According to Mr. Strickland, Mr. Reed commented that if the plaintiff would "clean up the clutter," she "wouldn't be falling around." He testified that "[t]o his knowledge," the plaintiff injured her right shoulder, and that, before February of 2006, the plaintiff talked about problems with her right shoulder, although her shoulder injury did not limit her in any way.

Mr. Strickland also testified that Mr. Reed had told him about the February 2, 2009, incident at the PX and that Mr. Reed told him he was with the plaintiff at the time. Mr. Strickland acknowledged that Mr. Reed "was taking care of [the plaintiff] a bit" after her shoulder surgery

9

because her arm was in a sling. According to Mr. Strickland, after the plaintiff's shoulder surgery, she drove her car more than before because she changed churches to a church that was further away, and she traveled as far as New Johnsonville, Tennessee to do drug testing.

Mr. Strickland further testified that Mr. Reed told him that he did not think the plaintiff was hurt after February 2, 2006, and that "the kids were encouraging" the plaintiff to file the lawsuit. He also acknowledged that "maybe a couple of months" before he died, Mr. Reed got "mad" or "upset" with him, but Mr. Strickland had "no idea why." According to Mr. Strickland, Mr. Reed told him that he had "dropped" the lawsuit.

After Mr. Reed's death, Mr. Strickland testified that he had offered to buy a tractor from the plaintiff but that her son-in-law wanted it. According to Mr. Strickland, the plaintiff later told Mr. Strickland to take the tractor because if her son-in-law took it, he would not pay her. Mr. Strickland reported that thereafter he did not have any conversations with the plaintiff about the tractor, although the plaintiff called him to ask if he'd gotten a loan that he had applied for. According to Mr. Strickland, after he had the tractor for 2-3 weeks, the plaintiff and her son-in-law came to retrieve it on June 26, 2008. Mr. Strickland acknowledged that, when the plaintiff and her son-in-law came to retrieve the tractor, it would not start and he was accused of putting "bad fuel" in the tractor, but he testified that he was not mad at the plaintiff or her son-in-law. Mr. Strickland denied telling the plaintiff that he was through with her, but he acknowledged asking her to be careful.

Mr. Strickland explained that he "came forward" in July of 2008, because he discovered that the lawsuit was still pending when the plaintiff mentioned "waiting on her money from the lawsuit." He testified that he "felt it responsible to step forward and say that it's bogus," and that he had no reason to "get back" at the plaintiff.

On cross-examination, Mr. Strickland acknowledged signing a statement on July 11, 2008, that he had "no personal conflicts with" Mr. Reed or the plaintiff and that he was "not coming forward in order to 'get back' at them for anything or out of any spite for them personally." See

10

Plaintiff's Exhibit 10. Mr. Strickland also acknowledged testifying in his deposition that the personal conflict with Mr. Reed the year before "related to his accusing [Mr. Strickland] of stealing his trailer tires" was "not relevant to this." Mr. Strickland also acknowledged his deposition testimony that the plaintiff had a conflict with him, but he did not have a conflict with her related to her retrieving the tractor and accusing him of not paying her.

Upon questioning from plaintiff's counsel, Mr. Strickland clarified that the incident in which he described the plaintiff's falling in the basement was before her bypass surgery, and that Mr. Reed said that the plaintiff "probably should get surgery for her shoulder" rather than gastric bypass surgery. Although Mr. Strickland testified in his deposition that he believed that she was having problems with her right shoulder, he was not sure whether it was her right shoulder or her left shoulder. Mr. Strickland explained that both his testimony at trial and at his deposition was correct and that he was nervous at his deposition.

4. Barbara Scott has lived with Mr. Strickland for over two years. She testified that, after Mr. Strickland's deposition in August of 2008, the plaintiff made an "accidental phone call" to her house. According to Ms. Scott, although the plaintiff was trying to reach someone else, once she recognized Ms. Scott's voice, they had a conversation. Ms. Scott testified that the plaintiff said that she did not understand why "Ron was doing what he was doing and that her and her family were really upset and that they would find a way to get even." She also testified that the plaintiff said that if "it was found that she was fraudulent, that she could go to jail for what [Mr. Strickland] was saying." Ms. Scott explained that she did not "really agree with what was going on," specifically, that, although Mr. Strickland thought he was doing the right thing, she believed that he should have "minded his own business."

On cross-examination, Ms. Scott acknowledged that there has been friction between Mr. Strickland and the plaintiff since Mr. Reed's death and that their relationship had deteriorated. Ms. Scott described the plaintiff as a "nice person," and advised that she had no reason to doubt that the plaintiff inadvertently called her home. She further testified that she did not "feel that [the

11

plaintiff] was trying to threaten her" and that she did not take the plaintiff's statements as a threat. Rather, Ms. Scott agreed with plaintiff's counsel that the plaintiff was taking Mr. Strickland's statements seriously and was upset that he was charging her with committing a fraud that could put her in jail.

## III. FINDINGS OF FACT

**A.    The Court finds that the plaintiff had no preexisting condition in her right shoulder before her injury at the PX on February 2, 2006.**

The defendant argues that the absence of any notation in her medical records about problems with her right arm and shoulder does not prove that she did not suffer from right arm and shoulder problems before the incident at the PX. While that might be true in some circumstances, the amount of medical attention that the plaintiff received and the timing of her visits to medical practitioners leads to the conclusion that, if the plaintiff had had such problems prior to February of 2006, there would likely have been some indication in her medical records. She underwent extensive medical assessments prior to her gastric bypass surgery in April of 2004, and suffered from left shoulder problems in July of 2004. Not only is there no recordation of any issue about the plaintiff's right shoulder, or any issue about either shoulder before July of 2004, her medical records prior to her bypass surgery repeatedly reflect that she had no musculoskeletal symptoms and that, except as specifically noted, examinations were unremarkable. See Plaintiff's Exhibit 4.

The defendant argues that Mr. Strickland's testimony confirms that the plaintiff was "just putting on." See Docket Entry No. 48, at 19. It is not clear whether the defendant is suggesting that the plaintiff did not have a rotator cuff tear that necessitated surgery or whether her rotator cuff tear was not caused by the incident at the PX.

The plaintiff clearly had a rotator cuff tear. The MRI verified that. It strains credulity to believe that Dr. Beauchamp, a board certified surgeon, would have performed rotator cuff surgery if the plaintiff did not have a rotator cuff tear. Therefore, the "putting on" must refer to the plaintiff's linking the rotator cuff tear to the PX incident.

12

Although the Court cannot find that Mr. Strickland was deceitful, his testimony was confusing and at some times inconsistent and inconsistent with his previous deposition testimony and initial statement provided to the defendant. Although he attributed those inconsistencies to his being nervous, his prior experience testifying in court and depositions and his military background make it more difficult to attribute his consistencies to nervousness. Although the Court does not find that Mr. Strickland came forward in retribution against the plaintiff, the Court finds that the souring of his relationship with the plaintiff after Mr. Reed's death could have contributed to his genuinely held belief that the plaintiff is not being honest. Such a belief could well result in selective memories, incorrect interpretations, and/or placing undue emphasis on statements by the plaintiff and Mr. Reed.

Clearly Mr. Strickland had conflicts with the Reeds. Ms. Scott conceded that. It is difficult to accept Mr. Strickland's analysis and parsing of words. Although he attested that he had no conflicts with the plaintiff, he justifies that statement by explaining that, although the plaintiff had a conflict with him, he did not have any conflicts with her. The Court is also skeptical of his lack of memory of the conflict with Mr. Reed. Although Mr. Strickland testified at trial that he had no idea why Mr. Reed was upset with him a few months before his death, it is not reasonable to believe that if his close friend accused Mr. Strickland of stealing from him, he would not remember it. Again, the Court does not find that Mr. Strickland is fabricating all of his testimony in an effort to "get back" at the Reeds, portions of his testimony do, in fact, call into question the accuracy of his memories and interpretations of events and conversations.

Even though the defendant argues that Mr. Strickland's testimony is buttressed by the plaintiff's call to Ms. Scott after Mr. Strickland's deposition, Ms. Scott herself testified that she had no reason to believe that the plaintiff had not inadvertently called her, and Ms. Scott did not feel threatened or intimidated. Clearly, it was inappropriate for the plaintiff to call Ms. Scott, but her testimony does not doom the plaintiff's claim.

13

Even if Mr. Strickland were correct that the plaintiff fell in the basement in 2003, it is irrelevant. No medical records before her gastric bypass surgery or afterwards reflect any problem with her right shoulder. Ms. Yi's testimony that the plaintiff said "it's my bad shoulder," even if true, would only support an exacerbation of a right shoulder problem. Clearly, the plaintiff did not seek any medical treatment for any problems with her right shoulder so, even if she had such problems, they were not especially serious. The fact that the plaintiff sought medical attention in the summer of July 2004 for her left shoulder shows that she seeks medical attention when she has a problem, suggesting that she did not have any pain or reduction of range of motion in her right shoulder before the PX incident.

**B.      The Court credits Dr. Beauchamp's explanation that the sign falling on the plaintiff at the PX on February 2, 2006, caused her rotator cuff tear.**

Dr. Terry opines that the plaintiff could not have suffered a rotator cuff tear as a result of a sign falling on her shoulder. Dr. Beauchamp does not dispute that conclusion, but opines that when the sign fell, the plaintiff involuntarily jerked and that the jerking caused the tear. Although Dr. Terry unsuccessfully attempted to elicit specific information from the plaintiff about whether she moved or jerked, the Court finds that it is reasonable for the plaintiff to not have a specific recollection of her reaction when the sign fell on her. Having a sign fall on a customer is an unexpected event and it is not unreasonable that she could have involuntarily "jerked away" or otherwise jerked without her even realizing it.

The only proof of any other cause of her rotator cuff tear is Mr. Strickland's testimony that the plaintiff fell in the basement almost three years before the PX incident, and Ms. Yi's testimony that the plaintiff told her that her injury was to her "bad shoulder." The plaintiff, however, has a history of seeking medical attention. As previously noted, she underwent a year's worth of assessment before her gastric bypass surgery, giving her every opportunity to voice complaints about any right arm or shoulder problems. When she had problems with her left shoulder, she sought medical attention and her frozen shoulder condition was resolved with physical therapy. Again, it

14

is not reasonable to assume that the plaintiff would have suffered from a rotator cuff tear and not have sought medical attention for it.

**C.     The Court finds that the plaintiff suffered pain and discomfort between February 2, 2006, and her rotator cuff surgery on June 16, 2006.**

Although the defendant made much of the plaintiff's trip to Mexico before her rotator cuff surgery, the plaintiff never suggested that she was bedridden or otherwise incapacitated before her surgery. Traveling to Texas and walking across the border for a day trip to Mexico does not mean she was not injured or not in need of surgery. To suggest otherwise would call into question whether she really needed the rotator cuff surgery at all. The defendant put on no proof that the surgery was not necessary nor did the defendant so argue. A conclusion that traveling to Texas with a day trip to Mexico meant that she did not need surgery cannot be supported.

The defendant also suggests that riding home from Memphis on the back of a motorcycle with her husband somehow meant that she was not significantly injured. Alicia Zeedar, the plaintiff's daughter, testified that it was not necessary for a passenger to hold on to the driver and a passenger can lean back in her seat. It would seem that riding a motorcycle with a rotator cuff injury is probably not the smartest way to travel, and it would seem that Mr. Reed's driving the motorcycle with only one functioning eye would also be improvident. Regardless, the plaintiff's motorcycle trip does not mean that she did not have a rotator cuff injury or that surgery was not required.

**D.     The Court finds that, although the plaintiff suffered pain and discomfort prior to having rotator cuff surgery, she suffered significantly more pain and restrictions on her daily activities after the surgery.**

Mr. Strickland's testimony that the only difference between the plaintiff before and after her rotator cuff surgery was that she was in a sling is problematic. Either Mr. Strickland did not observe her very much or his observations defy common sense. While the plaintiff could be exaggerating the duration of her pain or other effects from her surgery, the Court finds that her reports of pain and

15

temporary disability after the surgery to be credible and are amply corroborated by other witness testimony.

**E.    The Court finds that, by the fall of 2006, the plaintiff was no longer in persistent pain and had regained most of her strength and range of motion.**

Although the proof showed that the plaintiff is still unable to reach high enough to retrieve dishes from a high shelf or to decorate a Christmas tree and cannot lift a heavy Thanksgiving turkey, those limitations appear to be the only residual effects after the fall of 2006. The plaintiff returned to work in September of 2006, and the plaintiff herself testified that she had improved to the extent of her improvement by October of 2006. Although the plaintiff testified that she still has pain when the weather changes or she overexerts, it is clear that she no longer suffers from persistent pain.

**F.    The Court finds that there is insufficient proof to connect the plaintiff's thumb condition to the February 2, 2006, incident.**

While the plaintiff contends that she informed her physician about the swelling and discomfort in her left thumb three days after the incident at the PX, there is no medical notation that she ever made a complaint about her thumb until May 2, 2006. Whether or not the plaintiff informed her physician about her thumb problems as early as she remembers, the proof does not support a conclusion that her thumb problem was as a result of the PX incident. She made no report to the PX personnel of any effect on any part of her body except her right shoulder and arm. She reported that she had gone into a squatting position without hitting the floor, and at no time reported that her hands hit the floor.

Although the plaintiff's proof showed that the plaintiff had not engaged in any activities that required repetitive hand motions that would normally be associated with the need for thumb trigger surgery, the Court simply cannot find the necessary causal link between the PX incident and her thumb problems. As plaintiff's counsel candidly admitted, the only link is the temporal relationship. That temporal relationship, in and of itself, is insufficient to tie the thumb problems to the PX

16

incident. The Court credits Dr. Terry's essentially unrebutted testimony that trigger thumb problems are not caused by sudden impact but rather by repetitive use. Although Dr. Beauchamp links the thumb problems to the PX incident, he does so solely on the plaintiff's own reports to him and does not provide any explanation for how the sign falling on the plaintiff could have caused her thumb condition.

**G.      The Court finds that Mr. Reed is entitled to damages for loss of consortium.**

Initially, the plaintiff and her husband, William E. Reed, filed this lawsuit, with Mr. Reed claiming damages for loss of consortium. Mr. Reed died in January of 2008, and his claims were revived. There was conflicting testimony about the extent to which the plaintiff "tended" to Mr. Reed. Not surprisingly, Mr. Strickland's testimony varied dramatically from the testimony of the plaintiff and her witnesses about the plaintiff's housekeeping and taking care of Mr. Reed. Although Mr. Reed was 75 at the time of the PX incident and had health problems and only one operable eye, he was clearly very active. He took care of his horses, rode his horses, and rode his motorcycle. If Mr. Reed, at his age and with his medical problems, is able to travel from Memphis by motorcycle, he is able to tend to and fend for himself. However, during the several months of recuperation after the plaintiff's surgery, he clearly had to assume responsibility for taking care of the plaintiff.

The defendant argues that, while Mr. Reed may have been without "traditional support from his wife during the period she recuperated from her surgery," he did not otherwise suffer. See Docket Entry No. 48, at 12. The Court agrees.

## IV.  CONCLUSIONS OF LAW

**A.  Collateral Source Rule**

The medical bills relating to the plaintiff's shoulder injury amount to $29,455.80. Of that amount, TriCare paid $5,958.78, and the plaintiff was responsible for $362.86. See Defendant's

17

Exhibit 3.  To the extent that the defendant contends that it is entitled to an offset for the medical expenses that were incurred but for which the plaintiff is not responsible, the question is whether the "collateral source rule" applies.  The governing state collateral source rule applies in actions brought under the Federal Tort Claims Act.  Douglas v. United States, 658 F.2d 445, 449 n.5 (6th Cir. 1981).[3]

Assuming the Court must follow Kentucky law since the injury occurred in Kentucky, Kentucky follows the collateral source rule that allows the plaintiff to (1) seek recovery for the reasonable value of medical services for an injury; and (2) seek recovery for the reasonable value of those medical services without consideration of insurance payments made to the injured party. Baptist Healthcare Sys., Inc. v. Miller, 177 S.W.3d 676 (Ky. 2005).  In Rideout v. Nguyen, 20008 WL 3850390 (W.D. Ky. Aug. 15, 2008), the defendant argued that the plaintiff should not be entitled to recover amounts for which neither the plaintiff nor the collateral source were liable.  The Court allowed defendants to file a post-trial motion to reduce the amount of judgment, if any, by any amounts that were "written off or forgiven" by a healthcare provider.  However, to the extent that $23,134.16 can be considered "written off," rather than representing a reduction pursuant to contractual obligations, the Kentucky Supreme Court in Miller rejected the proposition that monies not paid by the plaintiff or the collateral source should be deducted from any recovery as long as the medical expenses were reasonable.  In this case, the defendant has not argued that the medical expenses of $29,455.80 are unreasonable.

Therefore, the Court will include the full amount of $29,455.80 as part of the judgment in this case.

---

[3] At trial, defendant's counsel suggested that he raised the issue of the portion of the medical expenses for which the plaintiff is responsible to rebut the impression that the plaintiff would be responsible for the entire amount of the medical expenses and to emphasize that the government had not left her to the "wolves."

18

## B.    Awards in Other Rotator Cuff Injury Cases

To the extent that the defendant asks that the Court consider awards and settlements in other cases involving rotator cuff injuries, see Docket Entry No. 45, at 9-10, the defendant has not provided any authority that the Court may or should consider such awards and the Court agrees with the plaintiff that is not appropriate to consider such cases.

## C.    Dead Man's Statute

The Court permitted hearsay testimony of what Mr. Reed said to various witnesses, including Ron Strickland. Although Mr. Reed died during the pendency of this case, his claim for loss of consortium remains. Plaintiff's counsel objected that such testimony was inadmissible under the Dead Man's statute. Although the defendant addressed the issue in its post trial filing, see Docket Entry No. 48, at 16 n.5, the plaintiff did not address the issue in any post-trial filing. The Court has considered the testimony at issue but has not reduced the judgment awarded to the plaintiff as a result. Therefore, even if it were error to have considered the testimony, it was harmless.

## D.    Rebuttal Witness

The plaintiff objected to the defendant's proffering the testimony of Barbara Scott as a witness since she was not listed on the defendant's witness list. Impeachment witnesses need not be listed on a party's witness list. See Rule 26(a)(3)(A) of the Federal Rules of Civil Procedure. Although defendant's counsel referred to Ms. Scott as a "rebuttal" witness, the Court assumes that he intended to describe her as an impeachment witness. Based on the plaintiff's testimony on cross-examination, the defendant properly called Ms. Scott to testify as an impeachment witness.

## V.  AWARD OF DAMAGES

The Court awards the following damages:

1. $29,455.80 in medical expenses.

2. $10,000.00 for Mr. Reed's loss of consortium.

3. $25,000.00 for the plaintiff's pain and suffering between February 2, 2006, and June 16, 2006.

4. $80,000.00 for the plaintiff's pain and suffering from June 16, 2006, until October 7, 2006.

5. $25,000.00 for the plaintiff's pain and suffering and permanent limitations after October 7, 2006.

An appropriate order will enter.

_____
JULIET GRIFFIN
United States Magistrate Judge